UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |
|---|---|
| ADAM J. VISNICK and HOWARD VISNICK, <br><br> Plaintiffs, <br><br> v. <br><br> SANCTUARY 4298 INVESTMENTS LLC, <br><br> Defendant. | CIVIL ACTION <br> NO. 04-10815 MLW |

### DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Sanctuary 4298 Investments LLC ("Sanctuary") hereby opposes the Plaintiff's request for a preliminary injunction seeking to enjoin the foreclosure sale and the discharge of the mortgage subject to the posting of $300,000 with the Clerk as security. As discussed in more detail below, the Plaintiffs' motion must be denied where: (a) they have no likelihood of success on the merits of their claims; (b) they will not suffer irreparable harm if the injunction is denied; (c) no public policy considerations will be effected by the foreclosure sale; and (d) the Plaintiffs' offer to post $300,000 is contingent upon the selling of Adam Visnick's home, the occurrence of which is not a certainty for several reasons, and moreover, the amount of $300,000 is woefully inadequate to satisfy the judgment likely to be entered in favor of Sanctuary at the conclusion of this litigation.

Accordingly, the Plaintiffs' motion should be DENIED.

I. FACTUAL AND PROCEDURAL BACKGROUND

Adam Visnick was in financial trouble because his business, Rockport Whale Watch Corporation, had failed and he was in need of money to "pay outstanding obligations." (See

Affidavit of Adam Visnick, Dated April 22, 2004, at ¶6; see also Affidavit of Howard Visnick, Dated May 5, 2004, at ¶3). According to a "Credit Explanation" drafted and executed by Adam Visnick, he incurred substantial business debts in connection with his purchase of an excursion boat to be used in his business, and in May of 2002, his landlord obtained a judgement against him as president and sole shareholder of his business. (See Credit Explanation, dated October 3, 2003, attached hereto as Exhibit A).

On or about December 18, 2002, Howard Visnick wrote to Bob Abram's attorney, David Wardwell, asking if could supply a letter to Adam's attorney stating that Mr. Abrams "might loan Adam Visnick funds sufficient to pay the [??] 9K arrearages" on Adam's boat, which was the subject of a court proceeding the following day. (See Letter from Howard Visnick to David Wardwell, dated December 18, 2002, attached hereto as Exhibit B, and Letter from David Wardwell to Robert Wolfe, dated December 18, 2002, attached hereto as Exhibit C).

In or around January of 2003, Howard Visnick again contacted Bob Abrams and told him that Adam was having business troubles and was in default on a loan that Adam had taken out in connection with his whale watching business. (See Affidavit of Robert Abrams at ¶4). Upon information and belief, the collateral for that commercial loan was his house in Gloucester, MA, which was going to be the subject of foreclosure proceedings. (Id. at ¶4). Howard Visnick indicated that one of Adam's boats, which he needed for his business, was also going to be taken because of the default on the commercial loan. (Id.) Accordingly, in or around January 6, 2003, Howard Visnick faxed a handwritten plea to Bob Abrams for financial assistance in connection with saving Adam's boat and his house. (See Fax Cover Sheet from Howard Visnick to Bob Abrams, attached hereto as Exhibit C; see also Affidavit of Bob Abrams at ¶4).

Bob Abrams agreed to provide Adam Visnick, through Sanctuary 4298 Investments LLC ("Sanctuary"), with a commercial loan to save his boat and business, and therefore, prevent the foreclosure of his home in Gloucester. (Affidavit of Bob Abrams at ¶5). Mr. Abrams set up Sanctuary in 1997 when he and his wife, Alice Abrams, moved into their house at 4298 Sanctuary Lane in Boca Raton, FL. (Id. at ¶2). Sanctuary was established as a matter of convenience just to keep the title of the Abrams' home separate from their other personal investments. (Id.) Sanctuary was not established for the purpose of loaning money or extending credit. (Id.)

In order to stave off looming court proceedings, time was of the essence in consummating and funding the loan transaction between the Plaintiffs and Sanctuary. In fact, the Plaintiffs contacted Mr. Abram's closing attorney, David Wardwell, and asked for the courtesy of a $15,000 immediate advancement on the total loan disbursement to present at a hearing in federal court relating to the boat. (See Affidavit of Attorney David Wardwell at ¶7). This arrangement was memorialized in a hand-written agreement by Howard Visnick, dated January 21, 2003. (See Exhibit E, attached hereto).

At the closing on the loan between Sanctuary and the Plaintiffs, Attorney David Wardwell met with Adam and Howard Visnick in his office and specifically asked each of them if the loan was for commercial purposes, because otherwise, he could not disburse the loan proceeds for three days due to the rescission period. (See Affidavit of David Wardwell at ¶6). Both Howard and Adam Visnick stated that the loan was for commercial purposes. (Id. at ¶6). Based on the Plaintiffs' representations, David Wardwell did not believe any notice of right of rescission was necessary. (Id.) Neither Adam nor Howard Visnick said anything to lead Mr. Wardwell to believe otherwise. (Id.)

The following day, on January 22, 2003, David Wardwell, acting on behalf of Sanctuary, disbursed $260,000 in loan proceeds by writing checks directly to various persons and/or entities, including a wire transfer of $178,441.23 to Chase Manhattan Mortgage Corp. (See Exhibit F, attached hereto). Although Adam Visnick asserts in his affidavit filed with the Complaint that he wanted to refinance his home so he could "use the equity to support himself" (in addition to paying of outstanding debt), this is belied by the fact that that he only received a remaining balance of $477.62 from the total loan of $260,000, after all existing debts were paid directly from the loan proceeds. (See Exhibit F).

The Plaintiffs subsequently defaulted on Sanctuary's loan without making any payments other then those that were pre-paid at the closing out of the loan proceeds. Out of concern regarding the repayment of the loan, attorney David Wardwell asked Adam and Howard Visnick to come to his offices to discuss the matter. (Affidavit of David Wardwell at ¶9). Contrary to the assertion raised in the Plaintiffs' affidavit, Mr. Wardwell did not show Adam or Howard Visnick a waiver of the right of rescission form. (Id. at ¶10). Instead, Mr. Wardwell attempted to confirm the conversation he had with the Plaintiffs prior to their execution of the loan documents regarding the commercial purpose of the loan. (Id.) However, Howard Visnick denied the conversation occurred, asserting to the effect that he "had a convenient memory." (Id.)

## II.    STANDARD FOR ISSUANCE OF PRELIMINARY INJUNCTION.

The familiar standard for obtaining a preliminary injunction is well established in this district. Hannon v. Allen, 241 F.Supp.2d 71, 73 (D.Mass. 2003). The court must weigh the following four factors: (1) whether the plaintiff has shown a likelihood of success on the merits; (2) whether the plaintiff has established an imminent threat of irreparable harm in the absence of

a preliminary injunction; (3) the balance of the hardship to the plaintiff if no injunction is issued against the hardship to the defendants if the requested injunction is ordered; and finally (4) the effect of the proposed injunction on the public interest. Id. (citations omitted). See also McGuire v. Reilly, 260 F.3d 36, 42 (1st Cir. 2001), citing Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996). The burden of proving each of these four elements rests with the party seeking injunctive relief. Cablevision of Boston, Inc. v. Public Imp. Com'n of City of Boston, 38 F.Supp.2d 46, 53 (D.Mass. 1999), citing Ocean Spray Cranberries, Inc. v. Pepsico, Inc., 160 F.3d 58, 60 (1st Cir.1998).

Of these four familiar factors, likely success on the merits is the most important. See SEC v. Fife, 311 F.3d 1, 8 (1st Cir. 2002) ("The 'sine qua non' of a preliminary injunction analysis is whether the plaintiff is likely to succeed on the merits of its claim"), quoting Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993). "If a great showing of likely success on the merits is made by a plaintiff, a reduced showing of irreparable harm may be appropriate." Hannon v. Allen, 241 F.Supp.2d at 73.

In addition, in order to demonstrate that harm claimed is irreparable, the party seeking the injunction must show that such harm "must be of 'a substantial injury that is not accurately measurable or adequately compensable by money damages....'" Global Naps, Inc. v. New England Telephone & Telegraph Co., 226 F.Supp.2d 279, 280 (D.Mass. 2002) quoting Philip Morris Inc. v. Harshbarger, 159 F.3d 670, 673-74 (1st Cir. 1998). Where the harm is easily measurable in terms of monetary relief, there can be no irreparable harm. See Leisure Time Cruise Corp. v. Town of Barnstable, 62 F.Supp.2d 202, 211 (D.Mass. 1999). Finally, injunctive relief does not issue automatically even if the foregoing criteria indicate that an injunction is warranted. Converse Constr. Co. v. Massachusetts Bay Transp. Auth., 899 F.Supp.

753, 760 (D.Mass.1995). A court "may properly consider any inequitable conduct by the plaintiff." Cablevision of Boston, Inc. v. Public Imp. Com'n of City of Boston, 38 F.Supp.2d at 53.

With this framework in mind, the Plaintiffs' request for injunctive relief must be denied where each of these factors weighs in the Defendant's favor.

### III.    THE PLAINTIFFS HAVE NO LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CLAIMS.

The Plaintiffs have brought two claims against the Defendant in the Complaint. Count I alleges a violation of the Truth in Lending Act ("TILA"), 15 U.S.C. §1640, et seq., based on the Defendant's alleged failure to provide them with a notice of a right to rescind the loan under 12 CFR Section 226.23, otherwise known as "Regulation Z." In connection with this Count, the Defendants seek statutory damages, including but not limited to "actual damages, twice the amount of any finance charge in connection with the transaction and legal fees." (See Complaint at ¶24). Based on the same set of underlying facts, Count II alleges a breach of the covenant of good faith and fair dealing.

As discussed below, the TILA specifically exempts from its scope any extensions of credit *primarily* for business, commercial or agricultural purposes. See 15 U.S.C. §1603 (1); Reg. Z § 226.3(a)(1). In a transparent effort to circumvent this exemption, the Plaintiffs contend that the loan at issue was for personal purposes. However, this assertion is belied by the documentary evidence, the Plaintiffs' own admissions, and the facts and circumstances of this loan transaction. See Thorns v. Sundance Properties, 726 F.2d 1417, 1419 (9th Cir. 1984) (whether loan is for business or personal purpose is factual question based on circumstances surrounding transaction). See also Tower v. Moss, 625 F.2d 1161, 1166-1167 (5th Cir. 1980).

Consequently, as discussed below, the Plaintiffs cannot sustain their burden of proving a likelihood of success on the merits of their two claims.

    A.    <u>The Loan To Adam Visnick Was Primarily For Commercial Purposes, And Therefore, Was Exempt From The Truth In Lending Act.</u>

Based on the facts and circumstances discussed above, Sanctuary's loan to the Plaintiffs is exempt from the scope and requirements of the TILA where the proceeds were used primarily to pay off Adam Visnick's existing business debts, which was secured through a mortgage provided to Chase Manhattan Mortgage Corp. on Adam's house in Gloucester, MA.

In <u>Levites v. Chipman</u>, 30 Mass. App. Ct. 356 (1991), the Massachusetts Appeal Court addressed a virtually identical scenario to the present case. In <u>Levites</u>, the parents of a borrower agreed to be personal guarantors of several commercial loans made to their son's business, which bought and sold pleasure yachts. <u>Id</u>. at 357. As security, the parents gave the lender a real estate mortgage on their residence. <u>Id</u>. When their son's business defaulted on the loans, the lender brought a foreclosure action against the parent's residence. To ward off the foreclosure action, the parents and their son executed a new promissory note payable to the defendant (a new creditor), with a mortgage on the parents' home again being provided as security for the refinancing. <u>Id</u>. The majority of the loan proceeds from the defendant were used to satisfy the guarantee on their son's business loan and to discharge the mortgage held by that prior lender on their residence. <u>Id</u>. at 358. The balance of the funds was used to satisfy other debts, including taxes and legal and closing costs relating to the loan. <u>Id</u>.

When the plaintiffs subsequently defaulted on the defendant's promissory note, the defendant sought to foreclose on the parents' home. <u>Id</u>. The plaintiffs commenced an action seeking to enjoin the foreclosure and to rescind the loan based on alleged violations of M.G.L. c.

7

140D (Massachusetts Truth in Lending Law), and 15 U.S.C. §1601 et seq. (Federal Truth in Lending Act). Id. The trial court granted summary judgment in the defendant's favor on the grounds that the defendant's loan was a commercial loan, and hence, was exempt from coverage by either statute. Id. at 359. On appeal, the Appeals Court stated that "[i]n determining whether a loan is commercial or consumer in nature, '[w]e must examine the transaction as a whole and the purpose for which the credit was extended.'" Id. at 360, citing Tower v. Moss, 625 F.2d 1161, 1166 (5th Cir. 1980), and other cases cited. "The mere fact that the loan was secured by a mortgage on the plaintiffs' residence [was] not decisive of the issue." Id. at 361. Instead, the fact that more than half of the refinancing loan was used "to pay off debts to facilitate the obtaining of the [original] loan" rendered the refinancing a commercial loan that was "exempt from the provisions of G.L. c. 140D and 15 U.S.C. §1601 et seq." Id. Consequently, the Appeals Court affirmed the entry of summary judgement in the lender's favor.

In the present case, where the primary purpose for obtaining a loan from Sanctuary was to pay off existing business debts, including preventing the foreclosure on his home by Chase Manhatten Mortgage Corp. who had received a mortgage on the house as security for those business debts, the TILA does not apply to the transaction at issue. Where the Plaintiffs' claims are based on a non-existent right to rescission under the TILA, they are devoid of merit.

B.  The Plaintiffs' Representation As To The Commercial Purpose Of The Refinancing Exempts The Loan From The TILA.

Furthermore, when a commercial debt is subsequently refinanced, the exemption continues to exist if the borrow makes representations to the creditor – as in the present case - that the new credit is for an exempt purpose. In Conrad v. Smith, 42 Wash.App. 559, 561, 712 P.2d 866, 867 (1986), a lender initiated foreclosure proceedings on a defaulted refinance loan that was taken out to prevent a trustee's sale of the family home that was given as security on the

original loan on which the borrowers defaulted. The borrowers subsequently sought to rescind the refinanced loan based on an alleged violation of the TILA.

Despite a genuine dispute over whether the loan was for commercial or consumer purposes, the Court held that summary judgment was nevertheless appropriate where the borrowers had represented to the lender - within the text of the promissory note - that the loan was for a commercial or business purpose. Id. at 868-869. During the borrower's deposition, he testified that he knew the lender would rely on the text of the promissory note, and that he did not ask to delete the paragraph regarding the purpose of the loan because it "was the only way [he] could get the loan, and [he] was desperate." Id. at 869. Moreover, there was evidence in the record that the borrower "made numerous representations . . . during the loan process with the apparent intention of obfuscating matters. Id.[1]

Finally, the Court in Conrad noted that where an action to rescind under the TILA is an equitable proceeding, the court "should look not only at the violations by the creditor but should consider the course of action taken by the debtor." Id. at 869, citing Turner v. West Memphis Fed. Sav. & Loan Ass'n, 266 Ark. 530, 588 S.W.2d 691, 695 (1979). Based on all these facts and circumstances, the Court held that the loan was made for commercial purposes, and therefore, the TILA did not apply.[2]

Here, since the Plaintiffs made representations to Defendant's counsel as to the commercial purpose of the loan, obviously with the intent that he and Sanctuary rely on those representations so that the Plaintiffs could receive the loan funds prior to waiting the three-day rescission period, they should now be estopped from seeking injunctive relief premised on this

---

[1] The Court also noted that the "[o]fficial staff interpretations to the Code of Federal Regulations enumerate certain factors for determining whether a loan is for business or consumer purposes, including the borrower's statement of purpose of the loan." Conrad v. Smith, 712 P.2d at 869 n. 6, citing 12 C.F.R. § 226 Supp. 1, § 226.3(a)(2)(1983).

9

very issue. See <u>Cablevision of Boston, Inc. v. Public Imp. Com'n of City of Boston</u>, 38 F.Supp.2d at 53 (A court "may properly consider any inequitable conduct by the plaintiff.")

In summary, the Plaintiffs do not have a likelihood of success on the merits of Count I where the subject loan is exempt from the TILA because it was primarily for a commercial or business purpose, and the Plaintiffs made express representations to that effect for their own financial benefit and with the intention that the lender would rely on those statements when trying to determine if a notice of the right to rescind was required in this transaction. For all these same reasons, the Plaintiffs similarly have no likelihood of success on the merits of Count II of the Complaint where Sanctuary has not breached any covenant of good faith and fair dealing.[3]

C. <u>Alice Abrams Is Not A Mortgage Broker, And Therefore, Sanctuary Is Not A Creditor For Purposes Of The TILA By Virtue Of This Incorrect Allegation.</u>

Even if Sanctuary's loan to Adam Visnick was for a consumer purpose- which it was not, the Plaintiffs' claims still do not have a likelihood of success because Sanctuary is not a TILA creditor under 15 U.S.C. §1602(f) since Alice Abrams is not a "mortgage broker," as incorrectly

---

[2] The Court also granted the lender's request for attorney's fees and costs, which was based on provisions in the promissory notes and deed of trust. <u>Id.</u> at 870.

[3] The Plaintiffs also do not have a likelihood of success on their claim for statutory damages under the TILA. Count One of the Plaintiffs' complaint seeks, *inter alia*, statutory damages under 15 U.S.C. § 1640(a), including, "in particular but not in limitation, all actual damages, twice the amount of any finance charge in connection with the transaction and legal fees." Complaint, ¶ 24. The Plaintiffs' claims for damages, however, are time-barred. Section 1640(e) provides, "Any action under this section may be brought . . . within one year from the date of the occurrence of the violation." Where an action for damages is not filed within the one-year time period, it is barred. See <u>Rudisell v. Fifth Third Bank</u>, 622 F.2d 243 (6th Cir. 1980); <u>Basham v. Finance America Corp.</u>, 583 F.2d 918, 927-928 (7th Cir. 1978); <u>Qwenzer v. Advanta Mortgage Corp. USA</u>, 288 B.R. 884, 889 (D. Kan. 2003); <u>Webster v. Centex Home Equity Corp.(In re Webster)</u>, 300 B.R. 787, 803 (Bkpty. D. Okla. 2003). In this case, the alleged violation occurred on or about January 20, 2003, when Adam Visnick executed the promissory note secured by the mortgage deed on his residence, and the Defendant did not provide him with a notice of the right to rescind the transaction. Complaint, ¶¶ 9, 10. The Complaint was filed on May 23, 2004, more than one year after the alleged violation. As such, the claim for money damages under the federal TILA is time-barred under 15 U.S.C. § 1640(e).

10

alleged by the Plaintiffs.[4] (See Complaint at ¶7; Affidavit of Howard Visnick at ¶4; Affidavit of Adam Visnick at ¶7).

Although the term "mortgage broker" is not specifically defined under Regulation Z, Section 226.2(b)(3) thereof provides that "[u]nless defined in this regulation, the words used have the meanings given to them by state law or contract." In Massachusetts, the term "mortgage broker" is statutorily defined under M.G. L. c. 255E, §1 (relating to the licensing of mortgage lenders and brokers), as follows:

> Any person who for compensation or gain, or in the expectation of compensation or gain, directly or indirectly negotiates, places, assists in the placement, finds or offers to negotiate, place, assist in placement or find mortgage loans on residential property for others.[5]

Based upon this definition, Alice Abrams is not a mortgage broker for purposes of the TILA. Ms. Abrams retired in 1988, and has never placed, negotiated or arranged for any mortgage since her retirement. (See Affidavit of Alice Abrams at ¶2). Moreover, she has never been licensed as a mortgage broker in Massachusetts or any other state. (Id. at ¶2). She has never advertised or solicited any mortgages on behalf of Sanctuary, nor did she receive any compensation or benefit in connection with Sanctuary's loan to Adam Visnick. (Id. at ¶¶4, 8).

Furthermore, Ms. Abrams did not have any conversations or communications with Adam Visnick regarding the loan transaction with Sanctuary, nor did she have any conversations with Howard Visnick with respect to the loan. (Id. at ¶6). In fact, Ms. Abrams did not have any role in Sanctuary's loan to Adam Visnick. (Id. at ¶7). To the contrary, she strongly discouraged her

---

[4] In fact, the affidavits submitted by both Plaintiffs contain numerous false factual allegations. (See Affidavit of Robert Abrams at ¶3.) Moreover, the Plaintiffs' affidavits are inconsistent with each other on their face. For example, Adam Visnick's affidavit (at ¶2) asserts that his father, Howard, is a citizen of Massachusetts; whereas, Howard Visnick's affidavit (at ¶1) alleges that he is a citizen of Florida.

[5] "Mortgage Broker" is also virtually identically defined under M.G.L. c. 142A, §1 (Definitional section of "Regulation of Home Improvement Contractors").

11

husband, Bob Abrams, from loaning money to Adam through Sanctuary because Adam's brother, Jake, had been best friends with the Abrams' son for well over ten years. (Id. at ¶7; see also Affidavit of Robert Abrams at ¶6). Hence, the Plaintiffs' attempt to bring Sanctuary within the definition of a TILA creditor on the grounds that Alice Abrams is purportedly a "mortgage broker" is completely unsupported and blatantly incorrect.

In conclusion, the Plaintiffs have failed in their burden of establishing even a remote chance – let alone a substantial likelihood – of success on the merits of their claims. Where this factor is the 'sine qua non' of demonstrating entitlement to injunctive relief, this Court should deny the Plaintiffs' motion.

### IV. THE PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM BECAUSE ANY ALLEGED DAMAGE FROM THE FORECLOSURE SALE CAN BE COMPENSATED THROUGH MONEY DAMAGES.

In addition to having no likelihood of success on the merits, the Plaintiffs' motion only makes an unsupported and totally conclusory allegation that "[i]f the foreclosure sale proceeds, it will cause immediate and irreparable harm." (See Plaintiff's Motion for Expedited Hearing and Preliminary Injunction, dated May 6, 2004, at ¶8). No additional factual assertions or legal arguments are made on this important element of injunctive relief in the Plaintiffs' memorandum of law. Indeed, the only mention in all of the Plaintiffs' motions or affidavits regarding an imminent threat of irreparable harm is Howard Visnick's allegation that "[a] foreclosure sale would be unlikely to generate sales proceeds of $420,000 or more" – which is the amount of an alleged accepted offer to buy the subject property from a third party.[6] (See Affidavit of Howard

---

[6] The Plaintiffs' characterization of the foreclosure sale's proceeds as only being "unlikely" to reach $420,000 further defeats their request for injunctive relief where "[a] preliminary injunction 'is not warranted by a tenuous or overly speculative forecast of anticipated harm.'" Global Naps, Inc. v. New England Telephone & Telegraph Co., 226 F.Supp.2d 279, 280 (D.Mass. 2002), quoting Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 19

Visnick at ¶21; emphasis added). The Plaintiffs do not allege that the foreclosure will deprive them of their home. Rather, they allege that it will deprive them of the opportunity to sell their home.

However, contrary to establishing a threat of irreparable harm, this assertion actually establishes a clear formula for measuring the Plaintiffs' potential <u>monetary</u> damages in the event they prevail on their claims and are denied injunctive relief. Specifically, the difference in monetary value between the $420,0000 sale price from the alleged bona fide purchaser, and the sale price established at the foreclosure sale, would serve as one means of calculating and compensating the Plaintiffs for their damages.[7] As such, injunctive relief is inappropriate. See <u>Global Naps, Inc. v. New England Telephone & Telegraph Co.</u>, 226 F.Supp.2d at 280.

## V.  THE BALANCE OF HARM WEIGHS IN SANCTUARY'S FAVOR.

Contrary to the non-existent irreparable harm to the Plaintiffs, Sanctuary has suffered and continues to suffer harm if the foreclosure sale is enjoined. The Plaintiffs have now been in default on their loan for more than 9 months, and the foreclosure has already been rescheduled several times.[8] Sanctuary incurs additional unpaid accounts receivable with every passing day. Moreover, the alleged offer to purchase the house is still subject to contingencies – such as a home inspection – that render it an unreliable source of potential funds to pay off the loan.

---

(1st Cir.1996). Moreover, Adam cannot claim that he will be irreparably harmed by having to move out of his house upon the foreclosure since he must already be planning on moving out because of the alleged bona fide offer to purchase.

[7] This measure of damages, of course, assumes that the sale to the bona fide buyer actually was planning on going through with the transaction, which is currently still speculative where the home inspection has not occurred and Adam Visnick is currently delinquent in maintain insurance on the property (see Notice of Cancellation, attached hereto as Exhibit G) – which is not only a breach of the loan agreement with Sanctuary, but it runs contrary to a seller's typical obligation in a standard Purchase and Sale Agreement to maintain the insurance on the property pending its final sale.

[8] Indeed, Sanctuary has again postponed the foreclosure from May 19, 2004 until June 2, 2004, while this proceeding is pending. See Letter from Gary C. Crossen and Carlene A. Pennell to Robert S. Wolfe, dated May 7, 2004, attached hereto as Exhibit H).

13

Furthermore, the Plaintiffs' offer "to post $300,000 with the Clerk to secure any loss the defendant might sustain subject to the terms of a final adjudication" is made contingent upon "[i]f the property is sold." (See Page 6, Section 5, to Plaintiffs' Memorandum of Law; emphasis added). However, Fed. R. Civ. P. 65(c) prohibits the issuance of a preliminary injunction until security is provided, and therefore, the Plaintiffs' offer does not satisfy the requirements of Rule 65(c). Finally, $300,000 will be substantially inadequate to compensate Sanctuary for its potential damages where the pay-off figure on the loan as of April 13, 2004 had already reached $294,155.25 (with expenses), but does not include the accruing per diem interest on the loan, costs, and attorneys fees since that time, as well as attorneys fees that will be incurred in the future in connection with litigating this action - all of which are recoverable damages pursuant to the Promissory Note (at pp. 3, 4), and the Indemnification clause (Paragraph 21) in the original Mortgage and Security Agreement and Financing Statement.

## VI. THE DENIAL OF INJUNCTIVE RELIEF DOES NOT VIOLATE ANY PUBLIC POLICY CONSIDERATIONS.

In light of the above arguments that the TILA does not apply to the loan at issue, the denial of the Plaintiffs' request for injunctive relief does not violate any of the policy considerations underlying the TILA. Conversely, the issuance of injunctive relief would violate the public's interest in ensuring that parties are held to their contractual obligations and that the victims of broken obligations receive fair and speedy resolution and compensation for the harm wrongfully befallen them.

## VII. CONCLUSION

For the all reasons stated above, the Defendant, Sanctuary 4298 Investments LLC, respectfully requests that this Honorable Court deny the Plaintiffs' request for injunctive relief.

> Respectfully submitted,
>
> SANCTUARY 4298 INVESTMENTS LLC,
> By its attorneys,
>
> *[signature]*
> Gary C. Crossen, Esq., BBO #106580
> Carlene A. Pennell, Esq., BBO #631175
> Rubin and Rudman LLP
> 50 Rowes Wharf, 3rd Fl.
> Boston, MA 02110
> (617) 330-7000

Dated: May 11, 2004

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party (by mail) (by hand) and facsimile on 5/11/04

*[signature]*

15